## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

_____
|                                          |   |
| **PIEDMONT OFFICE REALTY TRUST,** | ) |
| **INC. f/k/a WELLS REAL ESTATE** | ) |
| **INVESTMENT TRUST, INC.,** | ) |
|                                          | ) |
|           **Plaintiff,** | ) |  **CIVIL ACTION**
|                                          | ) |  **NO.** 1:13-cv-2128-WSD
|           **v.** | ) |
|                                          | ) |  **JURY TRIAL DEMANDED**
| **XL SPECIALTY INSURANCE** | ) |
| **COMPANY,** | ) |
|                                          | ) |
|           **Defendant.** | ) |
|_____| ) |

## COMPLAINT

Plaintiff Piedmont Office Realty Trust, Inc. ("Piedmont") alleges as follows in support of its claims against Defendant XL Specialty Insurance Company ("XL"):

## PRELIMINARY STATEMENT

1.      XL is a large insurance company that received substantial premiums from Piedmont in exchange for broad insurance coverage.  Among other things, Piedmont purchased this insurance to protect itself and its directors against losses arising from Securities Claims.[1] This action arises from XL's refusal to honor the promises in its insurance policy with respect to losses incurred in an underlying lawsuit alleging violations of the federal securities laws.  The underlying suit involved claims falling squarely within the policy's insuring agreement for Securities Claims, and no exclusion in the policy bars or limits Piedmont's coverage.  Yet, XL

_____

[1]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the relevant insurance policy.

has nonetheless breached its contractual coverage obligations and refused to reimburse Piedmont for losses covered by the policy.  As a result of XL's wrongful denial of coverage, Piedmont has been forced to file this action to receive the benefit of the insurance coverage it purchased from XL.

## PARTIES, RELATED PERSONS, AND ENTITIES

2.      Piedmont is a corporation organized under the laws of Maryland with its principal place of business at 11695 Johns Creek Parkway, Suite 350, Johns Creek, GA 30097.

3.      XL is a corporation organized under the laws of Delaware with its principal place of business at 70 Seaview Avenue, Stamford, CT 06902.  XL is an insurer engaged in the business of selling insurance contracts to commercial entities in Georgia and elsewhere.

4.      XL provided insurance coverage to Piedmont under Excess Policy Number ELU93981-06 (the "XL Policy").

5.      XL issued the XL Policy to Piedmont as the Named Insured.[2]  The XL Policy also provides coverage to Wells Real Estate Funds ("Wells REF"), among others.  The XL Policy was delivered to Piedmont at its headquarters in the Atlanta metropolitan area, and the insurance broker that assisted in the placement of the XL Policy is located in Atlanta, Georgia.

6.      In exchange for the XL Policy, Piedmont paid XL substantial premiums from its Atlanta-area headquarters.

---

[2]   Piedmont was known as Wells Real Estate Investment Trust, Inc. ("Wells REIT") when the XL Policy was issued.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over XL because XL has submitted to jurisdiction in this state by: (a) transacting business in Georgia; and (b) entering into contracts of insurance covering an entity located within Georgia at the time of contracting.

9.      Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Piedmont's claims occurred in the Atlanta, Georgia metropolitan area.

**FACTUAL ALLEGATIONS**

10.     Piedmont incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-9 above.

**The Insurance Policies**

11.   Piedmont purchased Executive Advantage REIT Policy Number DONY349411002 (the "Liberty Policy") from Liberty Surplus Insurance Corporation ("Liberty").

12.   Liberty issued the Liberty Policy to Piedmont as the Named Insured.[3]   The Liberty Policy also provides coverage to Wells REF, among others.

13.     The Liberty Policy provides broad insurance protection for Piedmont against losses arising from third-party claims alleging wrongful acts on the part of Piedmont, its current or former directors and officers, and other Insureds under the Liberty Policy.  The Liberty Policy

---

[3]    Piedmont was known as Wells REIT when the Liberty Policy was issued.

has an applicable limit of $10 million, and has a policy period of September 1, 2006 to April 16, 2013.[4]

14.     The Liberty Policy contains several separate coverage sections providing different types of insurance to Piedmont, including the "Directors' and Officers' Liability" coverage section, the "Company Reimbursement and Management Liability" coverage section; the "Company Securities Claim Liability" coverage section; and the "Company Non-Securities Liability" coverage section.

15.     The Securities Claim coverage section contains the following insuring agreement:

> [T]he insurer will pay on behalf of the **Company Loss** … which
> the **Company** shall become legally obligated to pay as a result of
> a **Securities Claim** first made during the **Policy Period** …
> against the **Company** for a **Wrongful Act** which takes place
> during or prior to the **Policy Period**[.]

16.     The Liberty Policy defines a "Securities Claim" as "any **Claim** brought against the **Directors** and **Officers** or … the **Company** if such **Claim**:

(1)     alleges a violation of the Securities Act [sic] 1933, the Securities Exchange Act of 1934 any similar state statute of [sic] similar common law, or any rules or regulations promulgated thereunder;

(2)     arises from the purchase of [sic] sale of, or offer to purchase or sell, any securities issued by the **Company**, whether such purchase, sale or offer involved a transaction with the **Company**, or occurs in the open market; or

(3)     is brought by a security holder of the **Company** in his, her or its capacity as such, whether directly as a class action or as a derivative action [sic] behalf of the **Company**, or otherwise alleging a **Wrongful Act** of an **Insured**.

---

[4]   The original policy period of the Liberty Policy was September 1, 2006 to September 1, 2007.  The Liberty Policy was amended by a "runoff" endorsement, which extended the policy period to September 1, 2006 to April 16, 2013.  A true and correct copy of the Liberty Policy is attached to this Complaint as **Exhibit A**.

17.     If a Claim against Piedmont is covered under the Liberty Policy, Liberty is obligated to pay Piedmont's "Loss," which is defined to include, among other things, "sums which the **Directors** and **Officers** or … the **Company** are legally liable to pay solely as a result of any **Claim** insured by this Policy, including **Claims Expenses**, compensatory damages, settlement amounts and legal fees and costs awarded pursuant to judgements [sic]."

18.     "Claims Expenses" are defined in the Liberty Policy to include, among other things, "reasonably [sic] and necessary fees (including attorney's fees and experts' fees) and expenses incurred in the defense or appeal of a **Claim**."

19.     The Liberty Policy prohibits Liberty from unreasonably withholding its consent to settle any Claim under the Liberty Policy.

20.     The Liberty Policy provides $10,000,000 of insurance coverage for Loss, including Claims Expenses, attorney's fees, and settlement amounts resulting from Securities Claims against Piedmont and the other Insureds under the XL Policy.

21.     The XL Policy is an excess policy and also provides broad insurance protection for Piedmont against losses arising from third-party claims alleging wrongful acts on the part of Piedmont, its current or former directors and officers, and other Insureds.  The XL Policy has an applicable limit of $10 million, and has a policy period of September 1, 2006 to April 16, 2013.[5]

22.     The insuring agreement of the XL Policy provides that:

> [XL] will provide the Insured with insurance coverage for claims
> first made against the Insured during the Policy Period excess of

---

[5]   The original policy period of the XL Policy was September 1, 2006 to September 1, 2007.  Like the Liberty Policy, the XL Policy was amended by a "runoff" endorsement, which extended the policy period to September 1, 2006 to April 16, 2013.  A true and correct copy of the XL Policy is attached to this Complaint as **Exhibit B**.

the Underlying Insurance stated in ITEM 4 of the Declarations.
Coverage hereunder will apply in conformance with the terms,
conditions, endorsements, and warranties of the Primary Policy
together with the terms, conditions, endorsements and warranties
of any other Underlying Insurance.

23.    The Liberty Policy is the Underlying Insurance referenced in ITEM 4 of the

Declarations page of the XL Policy, and the XL Policy defines "Primary Policy" as the Liberty

Policy.  Accordingly, the XL Policy provides $10,000,000 of insurance coverage for, among

other things, attorney's fees and settlement amounts for Securities Claims against Piedmont in

excess of the $10,000,000 of insurance coverage provided under the Liberty Policy.

24.    Because the XL Policy follows form to the Liberty Policy, XL is prohibited from

unreasonably withholding its consent to the settlement of any Claims under the XL Policy.

### Underlying Securities Litigation

25.    Piedmont is a real estate investment trust ("REIT") primarily engaged in the

acquisition and operation of commercial real estate properties.  Piedmont began as a public

unlisted REIT, which means that Piedmont was required to file various reports with the

Securities and Exchange Commission, but Piedmont's shares were not listed on a national

exchange.  Piedmont's initial charter required Piedmont to list its shares on a national exchange

or liquidate by January 30, 2008 (the "Liquidity Deadline").

26.    In its early years, Piedmont was managed externally by a group of Wells REF's

affiliates (collectively, the "Advisor").  The Advisor provided Piedmont with a variety of

operational functions and advisory services, including information technology, human resources

administration, property management, and investment consulting.

27.     On February 5, 2007, in connection with a potential listing of its shares, Piedmont announced that it had entered into an agreement with the Advisor to merge the Advisor into Piedmont (the "Internalization").  The consideration for the Internalization was approximately $175 million worth of Piedmont shares.  Piedmont filed a proxy statement recommending that its shareholders approve the Internalization on February 26, 2007 (as supplemented, the "Internalization Proxy").

28.     On March 12, 2007, Washtenaw County Employees' Retirement System ("Washtenaw") filed a putative class action against Piedmont, certain of its directors and officers, Wells Capital, Inc., Wells Management Company, Inc., Wells Advisory Services I, LLC, Wells Real Estate Advisory Services, Inc., and Wells Government Services, Inc.,[6] in the United States District Court for the District of Maryland (the "Underlying Suit").[7]  The Complaint in the Underlying Suit (the "Original Complaint") purportedly asserted direct claims on behalf of Piedmont's shareholders as well as derivative claims on behalf of Piedmont. Among other things, the Original Underlying Suit Complaint alleged that Piedmont had violated § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 14a-1 promulgated thereunder, and § 20(a) of the Exchange Act, and that Piedmont's directors had breached their state law fiduciary duties.

29.     On March 30, 2007, Washtenaw filed a motion for a temporary restraining order, preliminary injunction, and expedited discovery, seeking to prevent the shareholder vote on the

---

[6]     The corporate defendants other than Piedmont were the various entities that comprised the Advisor.

[7]     The Underlying Suit is styled *In re Wells Real Estate Investment Trust, Inc. Securities Litigation*, No. 1:07-CV-862-CAP (N.D. Ga.).

Internalization, which was denied.  Piedmont's shareholders then approved the Internalization on April 16, 2007.  The Underlying Suit was then transferred to the United States District Court for the Northern District of Georgia.

30.     After the Underlying Suit was transferred, on June 27, 2007, Washtenaw filed an amended complaint (the "First Amended Complaint").  The First Amended Complaint also alleged that Piedmont had violated § 14(a) of the Exchange Act, Rule 14a-1 promulgated thereunder, and § 20(a) of the Exchange Act, and that Piedmont's directors had breached their state law fiduciary duties.  The First Amended Complaint asserted both direct and derivative claims.

31.     Piedmont and the other defendants in the Underlying Suit moved to dismiss the First Amended Complaint, and on March 31, 2008, the Court granted in part and denied in part the defendants' motion.  The Court dismissed all of Washtenaw's state law claims and derivative federal securities claims.  The only claims that survived were a limited subset of Washtenaw's direct claims under § 14(a) of the Exchange Act, Rule 14a-1 promulgated thereunder, and § 20(a) of the Exchange Act.

32.     At the Court's direction, Washtenaw filed a second amended complaint without the dismissed claims (the "Second Amended Complaint").  Piedmont and the other defendants answered the Second Amended Complaint, and after conducting discovery, moved for summary judgment on Washtenaw's remaining claims.  By order dated August 2, 2010, the Court denied the defendants' motion for summary judgment.

33.     Trial in the Underlying Suit was scheduled for March 2012.  Before trial, however, Washtenaw requested that the Court certify certain pre-trial rulings for appellate

8

review.  The Court agreed to do so, and as part of that process, the Court agreed to consider a new motion for summary judgment raising other disputed legal issues.  On September 26, 2012, the Court granted summary judgment in favor of Piedmont and the other defendants on all of Washtenaw's remaining claims.

34.     Washtenaw filed a notice of appeal in the Underlying Suit on October 12, 2012.

### XL's Failure To Honor Its Obligations Under the XL Policy

35.     Piedmont provided Liberty and XL timely notice of the Underlying Suit in March 2007.  After receiving notice, Liberty acknowledged in writing that the Underlying Suit was a Securities Claim under the Liberty Policy.

36.     Liberty paid defense costs in the Underlying Suit as covered Claims Expenses under the Liberty Policy, which payments exhausted the $10 million limits of the Liberty Policy. Given exhaustion of the Liberty Policy, XL as the next layer excess carrier began paying defense costs in the Underlying Suit as covered Claims Expenses under the XL Policy.

37.     The parties to the Underlying Suit scheduled a mediation to begin on October 11, 2012.  At the time of the mediation, over $6 million in limits remained under the XL Policy. Before the mediation, Piedmont requested XL's consent to settle the Underlying Suit up to the remaining limits of the XL Policy.  XL unreasonably refused Piedmont's request.

38.     XL attended the mediation and from the outset took the unreasonable position that it was unwilling to contribute more than $1 million to any potential settlement, notwithstanding XL's acknowledgement that the Underlying Suit is a covered Securities Claim under the XL Policy and the fact that Washtenaw demanded over $158 million in damages in the Underlying Suit.  Piedmont kept XL apprised of all developments during the mediation, including offers and

counteroffers to settle, but despite a request to XL that it consent to the settlement, XL maintained the unreasonable position that it was unwilling to contribute more than $1 million to the settlement.

39.    Washtenaw eventually indicated that it was willing to withdraw its appeal and settle all claims arising in connection with the Underlying Suit for a payment of $4.9 million. Despite XL's unreasonable refusal to consent to the full settlement, Piedmont and the other defendants agreed to settle the Underlying Suit for $4.9 million.

40.    By unreasonably refusing to consent to the requested settlement for $4.9 million, XL put its own interests ahead of Piedmont's and the other Insureds' interests, subjecting them to the risk of reversal on appeal, the significant costs of discovery and trial, and alleged damages well in excess of the limits of their insurance coverage.

41.    On November 8, 2012, Piedmont wrote a letter to XL on behalf of all Insureds under the XL Policy demanding payment of the full $4.9 million settlement in the Underlying Suit and notifying XL that Piedmont would be forced to seek all relief available under O.C.G.A. § 33-4-6 if XL continued to refuse to honor its obligations under the XL Policy.

42.    XL responded by letter dated January 4, 2013, asserting that Piedmont had voluntarily agreed to settle the Underlying Suit without XL's consent and that the $4.9 million settlement amount was unreasonable, but the letter failed to explain how refusing to pay an additional $3.9 million[8] for an admittedly covered Securities Claim was reasonable in light of the substantial risks to which XL exposed Piedmont and the other defendants.

---

[8]    XL was willing to pay (and did pay) only $1 million toward the full settlement amount in the Underlying Suit.

43.     On April 18, 2013, the Court entered a final order approving the settlement in the Underlying Suit.

44.     On April 19, 2013, Piedmont yet again wrote a letter to XL on behalf of all Insureds under the XL Policy reiterating its demand for payment of the full $4.9 million settlement in the Underlying Suit and notifying XL that Piedmont would be forced to seek all relief available under O.C.G.A. § 33-4-6 if XL continued to refuse to honor its obligations under the XL Policy.

45.     XL responded on April 29, 2013 by contributing $1 million towards the settlement of the Underlying Suit.  XL, however, maintained its refusal to honor its obligation under the XL Policy to pay the remaining $3.9 million of the settlement.

46.     Because XL unreasonably withheld its consent to the settlement and refused to honor its obligation to fund the full settlement amount in violation of O.C.G.A § 33-4-6, Piedmont and the other defendants were forced to pay $3.9 million to settle the Underlying Suit without the benefit of the insurance coverage Piedmont purchased from XL.

## COUNT I
## BREACH OF CONTRACT

**(FOR REFUSING TO FUND THE FULL
SETTLEMENT IN THE UNDERLYING SUIT)**

47.     Piedmont incorporates by reference, as if fully set forth herein, the facts set forth above in paragraphs 1-46 above.

48.     The XL Policy is an insurance contract under which XL was paid substantial premiums in exchange for providing broad insurance coverage, including coverage for losses arising from the Underlying Suit.

11

49.     Piedmont has complied with all applicable provisions of the XL Policy.

50.     By denying coverage to Piedmont and the other Insureds for the full $4.9 million settlement in the Underlying Suit, XL has expressly and wrongfully denied its coverage obligations and declined to honor the promises it made when it issued the XL Policy.  XL's wrongful denial of its coverage obligations to Piedmont is a breach of the XL Policy.

51.     As a result of XL's breach of the Policy, Piedmont has sustained substantial damages, in an amount to be established at trial, for which XL is liable to Piedmont.

## COUNT II
## O.C.G.A § 33-4-6

### (STATUTORY DAMAGES FOR REFUSAL TO PAY)

52.     Piedmont incorporates by reference, as if fully set forth herein, the facts set forth above in paragraphs 1-51 above.

53.     On November 8, 2012, and again on April 19, 2013, Piedmont sent demand letters to XL, demanding that XL fulfill its legal obligations under the XL Policy by funding the full $4.9 million settlement in the Underlying Suit.  These demands informed XL that, if it refused to pay the full amount demanded as required by the XL Policy, Piedmont would assert a claim under O.C.G.A. § 33-4-6 for all available damages and relief.

54.     Piedmont and the other defendants were forced to pay $3.9 million to settle the Underlying Suit without the benefit of the insurance coverage Piedmont purchased from XL. Piedmont's claim for coverage under the XL Policy for reimbursement of the full settlement amount has therefore, by the terms of the XL Policy, become due and payable.

55.     Upon the date of filing this Complaint, more than sixty days have passed since Piedmont's November 8, 2012 and April 19, 2013 demand letters.

56.    XL has failed to act in good faith in refusing to pay Piedmont's claim under the XL Policy.  There are no legitimate or substantial legal grounds for XL's denial of coverage to fund the full settlement of the Underlying Suit.

57.    XL's failure to act in good faith has inflicted upon Piedmont and the other Insureds expense, loss, and injury in addition to the amount claimed under the XL Policy.

58.    Pursuant to O.C.G.A. § 33-4-6, Piedmont is entitled to statutory penalties, in an amount to be determined by a jury, of up to 50% of XL's total liability under the XL Policy for the Claim, plus the attorneys' fees Piedmont has incurred in this lawsuit.

**PRAYER FOR RELIEF**

**WHEREFORE,** Piedmont respectfully prays that the Court:

(1)    enter judgment on Count I of the Complaint in favor of Piedmont and against XL;

(2)    enter judgment on Count I of the Complaint for compensatory damages in favor of Piedmont and against XL in an amount sufficient to compensate Piedmont for all losses sustained as a result of XL's breach of the Policy and refusal to pay the full $4.9 million settlement of the Underlying Suit;

(3)    enter judgment on Count II of the Complaint awarding Piedmont up to an additional 50% of the total insured loss for the Claim that XL refused to pay in bad faith, plus the attorneys' fees incurred by Piedmont in pursuing recovery in this lawsuit;

(4)    award to Piedmont and against XL prejudgment interest, to be calculated according to law, to compensate Piedmont for the loss of use of funds caused by XL's wrongful refusal to pay Piedmont for the full $4.9 million settlement in the Underlying Suit; and

(5)    award Piedmont such other, further, and additional relief as this Court deems just and appropriate.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Piedmont hereby demands that all claims in this action be tried to a jury.

Respectfully submitted this 25th day of June, 2013.

*/s/ Anthony P. Tatum*
Anthony P. Tatum
Georgia Bar No. 306287
Bethany M. Rezek
Georgia Bar No. 553771
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, GA  30309
404-572-4600 (Phone)
404-572-5138 (Fax)
ttatum@kslaw.com
brezek@kslaw.com

*Attorneys for Plaintiff*
